1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   VICTOR LEE SEVERANCE,

11               Petitioner,              No. CIV S-06-1964 FCD KJM P

12          vs.

13   MIKE EVANS, Warden,

14               Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction on four counts

18   of second degree armed robbery and his sentence of 119 years to life.  He claims that: (1) he was

19   denied the right to due process and a jury trial when the trial judge directed a verdict of sanity

20   (raised in grounds one and two of the petition); and (2) he was denied the right to represent

21   himself during the sanity phase of his trial.  Upon careful consideration of the record and the

22   applicable law, the undersigned will recommend that petitioner's application for habeas corpus

23   relief be denied.

24   /////

25   /////

26   /////

1

I. <u>Background</u>[1]

In a prior appeal, this court remanded this case for trial on defendant Victor Lee Severance's plea of not guilty by reason of insanity. At the beginning of that trial, the court denied defendant's belated request to represent himself.[2] At the end of the trial, the court granted the prosecution's motion for a directed verdict of sanity.

In this appeal, defendant contends the trial court erred in denying his request to represent himself and in directing a verdict of sanity. We conclude the trial court did not abuse its discretion in denying defendant's belated request for self-representation because defendant's purpose was "to delay or disrupt the proceedings." We also conclude that a trial court has the power to direct a verdict of sanity when there is no substantial evidence that the defendant was insane at the time of his crimes. Since that was the case here, the trial court did not err in taking the issue of defendant's sanity from the jury. Accordingly, we will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2000 defendant robbed a coffee shop, and in May 2000 he robbed two stores. At his arraignment in September 2000, he entered dual pleas of not guilty and not guilty by reason of insanity. Defendant represented himself in a jury trial on four counts of second degree robbery with four related weapon enhancements, with Howard McEwan serving as standby counsel.

The jury found defendant guilty of all four charges and found the weapon enhancement allegations true. At the outset of a separate jury trial on allegations of three prior convictions, defendant requested an attorney. After initially denying that request, the trial court appointed McEwan to represent defendant. The trial on the prior conviction allegations then proceeded, and the jury found those allegations true. The trial court subsequently sentenced defendant to four consecutive indeterminate terms of 25 years to life and to consecutive determinate terms totaling 19 years. No sanity trial was ever held.

In October 2002, this court affirmed the jury's verdicts but reversed the judgment and remanded the case for trial on defendant's insanity plea. The remittitur issued in January 2003.

---

[1] This statement of facts is taken from <u>People v. Severance</u>, 138 Cal.App.4th 305, 309-13 (2006).

[2] Such requests are often referred to as <u>Faretta</u> motions. (<u>See</u> <u>Faretta v. California</u> (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.)

Following various delays, the sanity phase of defendant's trial was held in October 2004.[3] At the outset of the trial, the court denied defendant's request to represent himself based on the conclusion that defendant's purpose was "to delay or disrupt the proceedings." Defendant testified on his own behalf.  The substance of his testimony was as follows:

In response to questions from his attorney, defendant testified he had not felt very well for the past four and one-half years, since the police bashed in his head.  He remembered the year 2000 only "[a] little bit."  He was not in control of himself then because whenever he gets hit in the head Satan takes control of his body and he goes crazy and does things he does not normally do.  Satan invites defendant to come join him, but defendant refuses because defendant is the Savior, who is here to rescue mankind.  Defendant has Satan trapped inside his body, and when he dies he will take Satan with him to a far-away planet, where Satan will leave his body and they will begin a new planet like earth.

Defendant did not remember taking a gun and trying to get money from somebody because when Satan takes control of his body, he goes into a state of fugue amnesia, which is caused from blows to the head and which he read about in a book.

That concluded the testimony defendant gave in response to questions from his attorney.  Defendant, however, was allowed to give additional testimony on his own, which was as follows:

Defendant is 50 years old and suffered severe head trauma about six times in his life.  The first time was when he was four years old and was run over by a hit-and-run driver.  In 1980, he was knocked out by a blow to the head with a baseball bat; in 1983, he suffered a similar fate from a bumper jack.  In 1986, he was hit on the head six times with the butt of a handgun; in 2000, the police bashed in his head, and he went crazy again.  All of the incidents, except the one in his childhood, caused him to become paranoid and schizophrenic.  Satan would take control of his mind, he would use heroin to kill the pain and speed to stay awake, and he would go in and out of consciousness, lose his memory, and wind up in jail.

Defendant believes he suffered some sort of brain damage from the accident when he was four because he is unable to think like a normal person.  He is 60 percent deaf and a real slow thinker.  He received no medical treatment for his childhood injury because his mother thought he was lying.

---

[3]  The details of those delays, which are relevant to defendant's claim that the trial court erred in denying his request to represent himself, are set forth more fully in the Discussion part of this opinion.

Defendant's father died when he was 8 and his mother remarried when he was 10.  His stepfather used to get drunk and beat him with a board.  When he turned 18, he was kicked out of the house, and he lived in a field.  There, he was abducted by aliens one night and they operated on his brain.  Now, he receives Morse code signals from outer space through his right ear.  His life of crime began when he burglarized a home for food and was put in the Department of Youth Authority for two years.  Since, his life has been pure hell.  He works, then gets depressed, loses his job, starts drinking, and winds up getting his head bashed in, which is when Satan takes control of his mind and body.  Eventually he ends up in jail for committing crimes without any memory of what he did because of the head trauma and amnesia.

Defendant never received treatment for mental illness while incarcerated.  He has been taking Paxil and Risperdal for three years and is now feeling really good.  He believes he has mad cow disease and believes he is dying.  Also, his little brother and his uncle were diagnosed with paranoid schizophrenia.  He hopes to be declared insane so he can go to a prison that has a mental facility.

Referring to a tape recording of a jailhouse conversation with his brother, defendant testified that his statement that he is "just playing the nut routine" was just "a jailhouse slang comment."[4]  He thinks it is funny and he uses it quite often, but he is not faking it.  The psychologists think he is faking it because he has an above-average IQ of about 140, and he majored in psychology.  They only interview him when he is on medication, living in a stable environment, and Satan is not in control of his body.

Defendant concluded his statement by saying he felt great for the first time in his life, and if you asked him, he would say he is not crazy right now, but he does know he is the Savior, here to rescue mankind.

On cross-examination, defendant admitted he pled no contest to a charge of robbery in 1984, but he claimed that was when he was hit on the head with a bumper jack and a baseball bat.  Defendant would not know if he was convicted of robbery in 1986 because that was after he got hit on the head with the butt of a gun.

At that point, the court told the jury it was taking judicial notice that the prior jury in the case had found defendant had three prior convictions for robbery.

---

[4]  In that conversation, when defendant's brother asked about his hair (which was apparently unkempt), defendant told his brother, among other things, "I'm doing the homeless nut routine."

On further cross-examination, defendant claimed he was
unconscious during the two robberies in May 2000, but he did not
commit any robbery in January 2000.  It was after January 15 when
the police bashed in his head.  He also admitted he wrote a letter to
a victim of one of the May robberies in which he said he was sorry
for doing what he did, that you cannot do much with an unloaded
BB gun, and asked her not to give the letter to the district attorney.

The tape of defendant's jailhouse conversation with his brother was
then played for the jury.

On further cross-examination, defendant claimed he had been
unable to answer questions the week prior during a competency
hearing because he was in shock and on medications, not because
he was trying to show he was unable to aid in his defense.

The prosecution then presented its case.  Daren Allbee, a deputy
with the Sacramento County Sheriff's Department, who was
familiar with defendant from the jail, testified defendant had never
told him about the Devil talking to him or anything of an unusual
nature.  Deputy Allbee also testified that he taped the conversation
between defendant and his brother.

Deputy Sheriff Michael Daniels testified about defendant's
behavior the previous week, before and during the competency
hearing.

Dr. Shawn Johnston, a psychologist, testified that he interviewed
and tested defendant in March 2003.  Dr. Johnston expressed his
opinion that defendant has an antisocial personality disorder, but he
knew exactly what he was doing when he committed the robberies.
Dr. Johnston further testified that defendant is not exaggerating; he
is "just plain making it up" and "outright malingering."  On
cross-examination, however, Dr. Johnston admitted that a person's
mental state could change dramatically in three years (which was
the time between defendant's crimes and the time of Dr. Johnston's
interview with defendant).

Dr. Bruce Ebert, a psychologist and attorney, testified that he
interviewed and tested defendant in April 2003.  In Dr. Ebert's
opinion, defendant does not have any kind of mental disorder or
defect that would cause him to commit crimes, but he has various
significant problems with antisocial behavior.  Defendant knew
what he was doing and was capable of distinguishing right and
wrong when he committed the robberies.  Like Dr. Johnston, Dr.
Ebert admitted on cross-examination that it is possible for a
person's mental condition to change drastically in three years.  Dr.
Ebert also testified that Risperdal is a very strong psychotropic
medication that is prescribed for people who hear voices.

/////

5

Following Dr. Ebert's testimony and defense counsel's acknowledgment that he had no further evidence, the prosecution orally moved for a directed verdict of sanity, contending there was no evidence "of sufficient substantiality to support any verdict, whatsoever."  In its motion, the prosecution cited People v. Ceja (2003) 106 Cal.App.4th 1071, 131 Cal.Rptr.2d 601, as authority for removing the issue of sanity from the jury.

Defense counsel objected to the motion, asserting that "[b]oth doctors . . . acknowledged that somebody's mental state can change drastically in a matter of a few years" and defendant's "testimony speaks for itself."

The trial court relied on Ceja as authority for granting the prosecution's motion, and after a lengthy series of comments on the evidence presented by the defendant and the prosecution, the court granted the motion on the ground that "defendant has failed to meet the burden of proving by a preponderance of the evidence that he suffered from a mental condition that rendered him incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act."

The court subsequently sentenced defendant to the same sentence as before – four consecutive terms of 25 years to life and an aggregate consecutive determinate term of 19 years.

II.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

6

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[5]  It is the habeas

petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

(2002).

The court will look to the last reasoned state court decision in determining

whether the law applied to a particular claim by the state courts was contrary to the law set forth

in the cases of the United States Supreme Court or whether an unreasonable application of such

law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

must perform an independent review of the record to ascertain whether the state court decision

---

[5]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not
grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 127 S. Ct. 2321, 2326-27
(2007).

1  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

2  words, the court assumes the state court applied the correct law, and analyzes whether the

3  decision of the state court was based on an objectively unreasonable application of that law.

4     It is appropriate to look to lower federal court decisions to determine what law has

5  been "clearly established" by the Supreme Court and the reasonableness of a particular

6  application of that law.  "Clearly established" federal law is that determined by the Supreme

7  Court. Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

8  appropriate to look to lower federal court decisions as persuasive authority in determining what

9  law has been "clearly established" and the reasonableness of a particular application of that law.

10  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

11  Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo,

12  365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of

13  Supreme Court precedent is misplaced).

14  III.  Petitioner's Claims

15    A.  Directed Verdict of Sanity

16     In petitioner's first claim, he argues he was denied the right to due process and a

17  jury trial when the trial judge "dismissed the jury and brought a verdict of 'sane' himself." (Pet.

18  at 6 (emphasis in original).)  In petitioner's second claim, he argues the evidence of his insanity

19  "was sufficient to submit to [a] jury" and that the trial judge "should have allowed the jury to

20  bring in a verdict." (Id.)

21     1.  State Court Decision

22     The last reasoned decision on these claims was issued by the California Court of

23  Appeal.  The court reasoned as follows:

24      Defendant contends the trial court has no power to take the issue of
    sanity from the jury under any circumstances and therefore the trial

25      court denied him his constitutional right to due process and his
    constitutional and statutory right to a jury trial by directing a

26      verdict of sanity.  He further contends that even if the trial court

has the power to direct a verdict of sanity, the court erred in doing so here because there was sufficient evidence for the jury to find he was insane at the time of his crimes.  We disagree on both points.

A

The Trial Court's Power To Direct A Verdict Of Sanity

* * *

2.  Power To Direct A Verdict Of Sanity

As we have noted, in People v. Ceja, supra, 106 Cal.App.4th at page 1071, 131 Cal.Rptr.2d 601, Division Four of the Second District Court of Appeal held that trial courts have the inherent power to remove an insanity defense from the jury when there is no evidence to support it and there is no constitutional infirmity in the court doing so.  In reaching this conclusion, the Ceja court (drawing in part on Justice Brown's concurring opinion in Hernandez) analogized a plea of not guilty by reason of insanity to a plea of once in jeopardy.  (Ceja, at p. 1085, 131 Cal.Rptr.2d 601.) Both are "'special plea[s]' with the burden of proof resting on the defendant."  (Ibid.)  Because neither plea involves the defendant's guilt of the underlying crimes,[6] the defendant has no presumption of innocence to aid him and therefore must prove the defense. (Ceja, at p. 1085, 131 Cal.Rptr.2d 601.)  If he fails to offer sufficient evidence to do so, then the court may remove the issue of sanity from the jury.  (Id. at p. 1089, 131 Cal.Rptr.2d 601.)

Defendant asserts that "Ceja is wrong because dismissal of a plea of not guilty by reason of insanity offends constitutional principles of due process and the right to present [an] affirmative defense to a jury, and also because the Legislature has, by statute, created the right to a jury trial on a plea of not guilty b[y] reason of insanity without giving the trial court any statutory authority to take the issue from the jury."

We begin with defendant's statutory argument.  It is true, as defendant notes, that "[n]o statute explicitly gives a trial court authority to direct a verdict against a defendant on the issue of an affirmative defense."  It is equally true, however, that the California Supreme Court long ago recognized the courts have that power inherently where the affirmative defense is in the nature of a special plea.  (See People v. Newell (1923) 192 Cal. 659, 667-668,

---

[6]  "[G]uilt and sanity are separate issues . . . .  Insanity, under California law, means that at the time the offense was committed, the defendant was incapable of knowing or understanding the nature of his act or of distinguishing right from wrong."  (People v. Hernandez, supra, 22 Cal.4th at p. 520, 93 Cal.Rptr.2d 509, 994 P.2d 354 (2000).)

221 P. 622 [special plea of once in jeopardy].)  This is so because "[i]t is just as necessary to support special pleas by proof [citation] as it is to interpose the pleas, and the failure to do either is to be deemed a waiver of the defense."  (<u>Id.</u> at p. 667, 221 P. 622.)

Defendant contends a special plea of not guilty by reason of insanity must be treated differently than a special plea of once in jeopardy because "[a] plea of once in jeopardy may raise a mixed question of law and fact," whereas "Penal Code section 25, subdivision (b), and section 1026, subdivision (a), specifically assigns to the jury, the factual question raised by a plea of not guilty by reason of insanity."

We are not persuaded.  Like a plea of not guilty by reason of insanity, a plea of once in jeopardy *usually* presents "an issue of fact . . . which the jury alone possesse[s] the power to pass upon."  (<u>People v. Bennett</u> (1896) 114 Cal. 56, 59, 45 P. 1013.)  If, however, "the defendant fails to support [the plea of once in jeopardy] with proof, . . . it becomes a question of law upon which the court must pass."  (<u>People v. Newell</u>, <u>supra</u>, 192 Cal. at p. 667, 221 P. 622.)

Defendant offers no logical reason why a plea of not guilty by reason of insanity should be treated any differently.  Like any issue that is usually treated as one of fact, the issue of a defendant's sanity can become one of law in the proper circumstances.  "An issue of fact is one where the evidence introduced will support a decision on either side, that is to say, reasonable minds could fairly differ as to the answer to the question posed. [Citations.] An issue of fact can become an issue of law when reasonable minds can draw only one conclusion from the evidence. [Citations.]  An issue of fact cannot be taken from a jury by the trial court and treated as an issue of law unless only one conclusion is legally deducible and any other conclusion cannot command the support of substantial evidence that will survive appellate review."  (<u>Pan Asia Venture Capital Corp. v. Hearst Corp.</u> (1999) 74 Cal.App.4th 424, 433, 88 Cal.Rptr.2d 118.)

As Justice Brown explained in her concurring opinion in <u>People v. Hernandez</u>, <u>supra</u>, 22 Cal.4th at page 528, 93 Cal.Rptr.2d 509, 994 P.2d 354, the California Supreme Court has long held that in cases involving the special pleas of once in jeopardy and former judgment of conviction or acquittal, "Where 'the evidence is uncontradicted or leads to a single conclusion a question of law is presented' [citation], and 'the trial court is not required to submit the question to the jury for a finding upon that plea' [citation]. Instead, the court may strike the plea [citation], or direct a verdict in favor of the prosecution or the defendant."  (<u>See</u>, <u>e.g.</u>, <u>People v. Bechtel</u> (1953) 41 Cal.2d 441, 445, 260 P.2d 31; <u>People v. Wilson</u> (1924) 193 Cal. 512, 514-515, 226 P. 5; <u>People v. Newell</u>, <u>supra</u>, 192 Cal. at p. 668, 221 P. 622.)  There is no logical reason these

same principles should not apply to a plea of insanity.  Just as a criminal defendant may be "precluded from presenting to a jury [a] defense such as unconsciousness [citation], diminished capacity [citation], [or] entrapment [citation], where there is insufficient evidence from which a reasonable jury could conclude that the particular facts underlying the instruction requested exist" (People v. Mapp (1983) 150 Cal.App.3d 346, 350, 198 Cal.Rptr. 177), so a criminal defendant may be precluded, through the grant of a directed verdict, from presenting an insanity defense where the evidence is insufficient for a reasonable jury to find the defendant was insane at the time of his crimes.

There is nothing in the statutes upon which defendant relies to suggest the Legislature intended the trial court to have to submit a plea of not guilty by reason of insanity to the jury in every case, even when the defendant has failed to support that plea with substantial evidence.

Subdivision (b) of Penal Code section 25 – the first statute on which defendant relies – provides that "[i]n any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."  This statute limits when a trier of fact can find the defendant not guilty by reason of insanity; it does not purport to require the issue of sanity to be submitted to a jury under all circumstances, even when the defendant has not offered substantial evidence of insanity.

Subdivision (a) of Penal Code section 1026 – the other statute on which defendant relies – details how a case is to be handled when a defendant pleads not guilty by reason of insanity, generally providing that the issue of sanity shall be tried before a jury.[7]

---

[7] "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed.  If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court.  In that trial, the jury shall return a verdict either that the defendant was sane at the time the offense was committed or was insane at the time the offense was committed.  If the verdict or finding is that the defendant was sane at the time the offense was committed, the court shall sentence the defendant as provided by law.  If the verdict or finding be that the defendant was insane at the time the offense was committed, the court, unless it shall appear to the court that the sanity of the defendant has been recovered fully, shall direct that the defendant be confined in a state hospital

11

1

2

Again, however, the statute does not purport to require the issue of sanity to be submitted to a jury even when the defendant has not offered substantial evidence of insanity.

3

4

We conclude there is no statutory bar to a trial court's directing a verdict of sanity.  Accordingly, we turn to defendant's constitutional arguments.

5

6

7

Defendant contends the constitutional right to trial by jury in a criminal case encompasses the sanity phase of the trial, and because "[a] court may not direct a verdict for the prosecution no matter how overwhelming the evidence may be," it follows that a court may not direct a verdict of sanity.  We disagree.

8

9

10

11

12

13

14

15

16

17

"The rule prohibiting verdicts directed against an accused emanates from the guarantee of due process and the right to a jury trial.  Due process 'protects the accused against conviction except upon proof beyond a reasonable doubt of *every* fact necessary to constitute the crime with which he is charged' [Citation.]  It requires the state to prove '"every ingredient of an offense beyond a reasonable doubt . . .."'"  (<u>People v. Figueroa</u> (1986) 41 Cal.3d 714, 725, 224 Cal.Rptr. 719, 715 P.2d 680.)  Thus, the defendant has a constitutional right to have a jury determine whether he committed the charged offense.  As Justice Brown explained in her concurring opinion in <u>Hernandez</u>, however, "Because a finding of insanity under California law 'is dispositive only on the question of whether the accused is to be held criminally responsible for committing the charged offense[,] it is not determinative of whether the elements of the offense, and thus the criminal conduct itself, have been established.' [Citations.]  Thus, taking the issue of insanity away from the jury does not violate the United States or California Constitution."  (<u>People v. Hernandez</u>, <u>supra</u>, 22 Cal.4th at p. 529, 93 Cal.Rptr.2d 509, 994 P.2d 354 (conc. opn. of Brown, J.).)

18

19

20

21

22

23

The mere fact that "[t]he 'sanity trial is . . . a part of the same criminal proceeding as the guilt phase'" (<u>People v. Hernandez</u>, <u>supra</u>, 22 Cal.4th at p. 521, 93 Cal.Rptr.2d 509, 994 P.2d 354) makes no difference.  In the guilt phase, the defendant is constitutionally entitled to a presumption of innocence which is infringed if the court directs a verdict of guilt.  In the sanity phase, there is no constitutional entitlement to a presumption of insanity, and the state can require the defendant to prove insanity by a preponderance of the evidence.  If he offers no substantial evidence to meet that burden of proof, then there is no constitutional bar to

24

25

26

for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility approved by the community program director, or the court may order the defendant placed on outpatient status pursuant to Title 15 (commencing with Section 1600) of Part 2."  (Pen. Code, § 1026, subd. (a).)

the trial court's directing a verdict of sanity.  Accordingly, we turn to the issue of whether defendant offered sufficient evidence in this case to meet his burden of proof.

B

The Directed Verdict of Sanity in This Case

1.  Standard Of Review

* * *

On appeal, we review a directed verdict de novo.  (Brassinga v. City of Mountain View (1998) 66 Cal.App.4th 195, 210, 77 Cal.Rptr.2d 660.)  Thus, we apply the same rules the trial court was supposed to apply in determining whether a directed verdict was proper.  For these rules, we turn to our Supreme Court's decision in Estate of Lances (1932) 216 Cal. 397, 14 P.2d 768, where the court explained as follows:  "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit.  A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.'  [Citations.]  Unless it can be said as a matter of law that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.  [Citation.]  A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom . . . .  The power of a court in passing upon such motions is strictly limited.  It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict . . . .'  [Citation.]  In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict.  Although the trial court may weigh the evidence and judge[] the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict."  (Id. at pp. 400-401, 14 P.2d 768.)

Thus, we do apply the substantial evidence standard of review, but in doing so we do not look for substantial evidence in support of

13

the trial court's ruling that defendant was sane; rather, we look for substantial evidence from which the jury reasonably could have found defendant was *not* sane.  If we find such evidence, then a directed verdict of sanity was improper.

Here, it is clear the trial court did not assiduously apply the rules set forth above in directing a verdict of sanity.  In explaining its ruling, the court referred to "the experts in this case [who concluded] that the defendant was sane" and to their "scientific testing" which "refuted" defendant's assertion that he suffered brain damage from repeated blows to the head.  These experts were *prosecution* witnesses.  Thus, the court failed to disregard conflicting evidence and instead relied on that evidence to justify its decision.

After that, the court quoted at length from the tape recording of the jailhouse conversation between defendant and his brother, which the prosecution offered into evidence to impeach defendant.  As it did so, the court inserted its own editorial comments about defendant's laughter,[8] defendant's presumed behavior during the conversation,[9] and the tone of defendant's voice.[10]  Indeed, the trial court even went so far as to "urge any reviewing Court to listen to the actual audiotape to capture the tone and inflection of this defendant."  The court also commented on defendant's laughter during the trial – something that does not appear as a matter of record – asserting that defendant laughed "because he thinks it's a great game, or it appeared to me, based on his conduct and my experience with other people laughing throughout my life.  [¶]  He laughed numerous times when the doctors called him more than a malingerer, an outright faker.  He thought that was great fun."

It was not for the trial court, however, on a motion for a directed verdict – any more than it is for us on appellate review of a directed verdict – to evaluate the tone of defendant's voice or his laughter to determine whether that tone appears to be "the mocking tone of arrogance."  *That* determination was for the trier of fact.

---

[8]  "This is laughter not of an insane individual or a person [who] is suffering from mental disease or defect, this is the mocking tone of arrogance.  It is the tone of laughter one would expect, for example, amongst good friends or in a fraternity house."

[9]  For example, when defendant said, "It's like this when I go to court, I'm like this," the court commented, "Presumably he's making a face."

[10]  For example, at one point the court observed, "clearly the defendant, as confirmed by his tone, inflection and conduct that this is all a great fraud that he's bringing before the – ."  The court's editorial comment was cut off only by defendant's assertion, "You're being biased, Your Honor.  That's being biased.  You can't do that."

Although qualifying his comments as "not in support of my ruling," the trial court also went on to assert that, based on his experience as a mental health judge, "this defendant does not in my personal experience display anything close to a mental disease or defect, and I have seen hundreds, if not thousands, of people that have suffered from those." Finally, in responding to defendant's claim that the court was being biased, the court stated, "Justice is blind, sir. You have the right to have fair treatment before these courts, but justice will not turn a blind eye to malingering, fraud or deceit. And that is what has occurred here. And that is what has been testified to by the doctors, that is what has been presented even through your own mouth . . . ."

The foregoing comments support the conclusion that the trial court essentially appointed itself the trier of fact, rather than adhering to its proper role, which was to determine whether the evidence, viewed in the light most favorable to defendant, was sufficient to send the case to the trier of fact. Because we review the trial court's ruling de novo, however, the court's mistake in this regard does not compel reversal. If we were to conclude the evidence, viewed in the proper light, was sufficient for a jury to reasonably find defendant was insane, then we would reverse the directed verdict. Because we conclude there was no such substantial evidence, however, we will affirm the verdict, having properly performed the task the trial court should have performed in the first place.

2.  The Test For Insanity

"The test of legal insanity in California is the rule in M'Naghten's Case (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722], as adopted by the electorate in June 1982 with the passage of Proposition 8. That measure added section 25, subdivision (b) [to the Penal Code], which provides: 'In any criminal proceeding ... in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.' Despite the use of the conjunctive 'and' instead of M'Naghten's disjunctive 'or,' this court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned." (People v. Lawley (2002) 27 Cal.4th 102, 169-170, 115 Cal.Rptr.2d 614, 38 P.3d 461, fn. omitted.) "The incapacity must be based on a mental disease or defect even though that requirement is not specifically mentioned in [Penal Code section] 25, subd[ivision] (b)." (People v. Stress (1988) 205 Cal.App.3d 1259, 1271, 252 Cal.Rptr. 913.)

/////

15

The question here, then, is whether defendant offered sufficient evidence for a jury to reasonably conclude that, based on a mental disease or defect, he was incapable of: (1) knowing or understanding the nature and quality of his acts; or (2) distinguishing right from wrong when he robbed the coffee shop in January 2000 and the two stores in May 2000.

3. The January 2000 Robbery

We can easily resolve that question regarding the robbery in January 2000. Defendant's evidence was to the effect that after he gets hit on the head, he does things he would not usually do (which he cannot remember). On cross-examination, however, he said he did not commit the robbery in January 2000 because he "was doing good" and "there's no reason for me to go out and commit crimes in January of 2000." He further claimed it was "after January 15th when the cops mistook me for some – for someone [who] had run away from them and they bashed my head in." The evidence in the guilt phase trial revealed the robbery of the coffee shop occurred on January 3, 2000. Thus, even viewing the evidence in the light most favorable to defendant, there is no substantial evidence on which a reasonable jury could have concluded he was insane when he robbed the coffee shop in January 2000.

4. The May 2000 Robberies

That leaves us with the robberies in May 2000. Acknowledging that an insanity defense cannot be solely based on an addiction to, or abuse of, intoxicating substances (Pen.Code, § 25.5), defendant contends his testimony "provided sufficient evidence to submit his plea of not guilty by reason of insanity to the jury, even if those portions of his testimony relating to his substance abuse are disregarded." That testimony was essentially that he was hit on the head in January 2000, and when he is hit on the head he becomes paranoid and schizophrenic, Satan takes control of his mind and body, and he does things he does not normally do. In addition, defendant testified he was abducted by aliens who are sending signals to his brain, that he is the Savior, and that he has been taking Paxil and Risperdal for three years. Risperdal is a very strong psychotropic medication that is given to people who hear voices. Also, defendant's brother and uncle both suffer from paranoid schizophrenia.

Based on this evidence, defendant contends "a rational jury could conclude that [he] is incapable of distinguishing right from wrong and . . . that [his] amorality is the product of a mental disease or defect." We disagree.

/////

/////

We note that even defendant does not contend the evidence was sufficient for the jury to find he was incapable of knowing or understanding the nature and quality of his acts when he committed the May 2000 robberies.  Instead, defendant relies entirely on the second part of the <u>M'Naghten</u> test – whether he was capable of distinguishing right from wrong when he committed the robberies.  Defendant emphasizes that the issue under the second part of the <u>M'Naghten</u> test is "whether a defendant can distinguish, not the legal rightness or wrongness of his act, but its moral rightness or wrongness."  (<u>People v. Stress</u>, <u>supra</u>, 205 Cal.App.3d at p. 1272, 252 Cal.Rptr. 913.)  Thus, if a person is incapable, because of a mental disease or defect, of understanding that his actions are morally wrong – that is, in violation of generally accepted standards of moral obligation – then that person is legally insane, regardless of whether he knows his actions are illegal.  (See <u>id.</u> at p. 1275, 252 Cal.Rptr. 913.)

Defendant suggests the jurors could have found he was insane because they could have concluded he was suffering from a delusion that his conduct was morally correct.  We disagree because the evidence simply did not speak to that point.  No evidence was presented from which the jury reasonably could have found defendant was acting under an insane delusion that robbing the two stores was somehow morally correct.  And in the absence of such evidence, defendant cannot prevail.

The hole in the evidence here is made clear by a comparison of this case to two other cases – <u>People v. Skinner</u> (1985) 39 Cal.3d 765, 217 Cal.Rptr. 685, 704 P.2d 752 and <u>People v. Stress</u>, <u>supra</u>, 205 Cal.App.3d at page 1259, 252 Cal.Rptr. 913.  In <u>Skinner</u>, the defendant, who suffered from paranoid schizophrenia, killed his wife while he was on a day pass from a mental hospital.  (<u>Skinner</u>, at p. 770, 217 Cal.Rptr. 685, 704 P.2d 752.)  "A delusional product of this illness was a belief held by [the] defendant that the marriage vow 'till death do us part' bestows on a marital partner a God – given right to kill the other partner who has violated or was inclined to violate the marital vows, and that because the vows reflect the direct wishes of God, the killing is with complete moral and criminal impunity.  The act is not wrongful because it is sanctified by the will and desire of God."  (<u>Ibid.</u>)  The Supreme Court characterized this as "clearly sufficient evidence, that [the] defendant could not distinguish right and wrong with regard to his act."  (<u>Id.</u> at p. 784, 217 Cal.Rptr. 685, 704 P.2d 752.)

In <u>Stress</u>, the defendant, who suffered from paranoid delusions, killed his wife as an attempt "'to have a day in court.'"  (<u>People v. Stress</u>, <u>supra</u>, 205 Cal.App.3d at pp. 1263, 1264, 252 Cal.Rptr. 913.)  The defendant "had been under a federal indictment for two years, charged with writing threatening letters to the President of the United States."  (<u>Id.</u> at p. 1263, 252 Cal.Rptr. 913.)  He believed a conspiracy existed between various agencies "to insure

that professional athletes were not drafted for service in the war. . . . Making the public aware of this conspiracy became a crusade." (Id. at pp. 1262-1263, 252 Cal.Rptr. 913.)  He "was concerned his case would not come to trial since it appeared the judge wanted him to receive psychiatric treatment."  (Id. at p. 1263, 252 Cal.Rptr. 913.)  The defendant had considered killing himself, but then no one could tell his story, so he killed his wife as "'the lesser of two evils.'"  (Ibid.)

The Court of Appeal concluded the evidence was sufficient to support a finding that the defendant could not distinguish between right and wrong because his "explanation for killing his wife was liberally sprinkled with comments indicating her death would contribute to some higher good.  He described his dealings with the government as a war and his wife as a soldier in that war.  While the center of [his] motivation was to be charged with a serious crime and thus be provided a forum to espouse his ideas, he at one time stated that if aware of the facts of his crusade, no jury would convict him.  We believe these facts can be interpreted as a belief by [the defendant] that while his act was illegal, it did not violate generally accepted moral standards."  (People v. Stress, supra, 205 Cal.App.3d at p. 1275, 252 Cal.Rptr. 913.)

Unlike in Skinner and Stress, here there was no evidence from which a jury reasonably could have found that defendant was suffering from a paranoid delusion that led him to believe his crimes were morally acceptable.  Indeed, there was no evidence about what defendant believed or did not believe in May 2000.  The gist of defendant's claim of insanity was that after he was hit on the head in January 2000, Satan took control of his mind and body and he did things he does not normally do-namely, rob two stores.  In the words [of] Flip Wilson playing Geraldine, "the Devil made him do it."  In essence, defendant's claim of insanity was a claim he acted under an "irresistible impulse."  The irresistible impulse test, however, has long been discredited in California as a test for legal insanity.[11]  (See, e.g., People v. Nash (1959) 52 Cal.2d 36, 45-46, 338 P.2d 416.)

/////

/////

/////

---

[11]  As our Supreme Court explained more than a century ago, "It must be held that, conceding that the act was the offspring of an irresistible impulse, and the impulse was irresistible because of mental disease, still the defendant must be held responsible if he at the time had the requisite knowledge as to the nature and quality of the act, and of its wrongfulness."  (People v. Hubert (1897) 119 Cal. 216, 223, 51 P. 329.)

18

> In summary, even if credited and viewed in the light most
> favorable to defendant, defendant's evidence did not provide a
> substantial basis for the jury to find that at the time he committed
> the robberies in May 2000, defendant believed his actions were
> morally acceptable.  Because there was no substantial evidence of
> legal insanity, the trial court did not err in directing a verdict in
> favor of the prosecution on that issue.

People v. Severance, 138 Cal.App.4th at 314-24 (emphases in original).

  2. Trial by Jury

   As provided by California law, when a criminal defendant enters dual pleas of not guilty and not guilty by reason of insanity, as petitioner did here, the trial court is required to resolve the issue of sanity at a separate trial.  Cal. Penal Code § 1026.  The California Court of Appeal determined on petitioner's initial appeal that the trial court erred by sentencing petitioner without holding a sanity trial.  On remand, the trial court directed a verdict of sanity after hearing all of the evidence submitted by the parties.

   Petitioner claims that the trial judge's action in directing a verdict of sanity without referring the matter to the jury deprived him of his federal constitutional rights to due process and a jury trial.[12]  As set forth above, the California Court of Appeal rejected petitioner's federal constitutional claims, reasoning that because sanity is not an element of the crime itself, there is no constitutional right to a jury trial on whether a defendant was sane at the time he committed his crimes.  A state trial judge may direct a verdict of sanity if the defendant fails to offer substantial evidence in support of his plea of insanity.  Severance, 138 Cal.App.4th at 318. The United States Supreme Court has not addressed whether a trial court deprives a criminal defendant of his rights to due process and a jury trial if it directs a verdict of sanity.  Because there is no United States Supreme Court case addressing this issue, the state court's decision on

---

  [12] Any argument that the trial judge's actions violated petitioner's state constitutional or statutory rights does not state a cognizable claim in federal habeas corpus.  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000). Therefore, this court will not address any claim based on a violation of state law.

1   petitioner's claims does not violate AEDPA and may not be set aside.  See Knowles v.

2   Mirzayance, ___ U.S. ___, 129 S.Ct. 1411, 1419 (2009) ("this Court has held on numerous

3   occasions that it is not 'an unreasonable application of clearly established Federal law' for a state

4   court to decline to apply a specific legal rule that has not been squarely established by this

5   Court"); Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004) ("If there is no Supreme Court

6   precedent that controls a legal issue raised by a petitioner in state court, the state court's decision

7   cannot be contrary to, or an unreasonable application of, clearly– established federal law.").

8           To the extent federal circuit law can serve as a guide in determining what the

9   Supreme Court has established, such law also does not support petitioner's claims.  In Leach v.

10  Kolb, 911 F.2d 1249 (7th Cir. 1990), the Wisconsin petitioner claimed it was a violation of

11  federal constitutional principles for a trial court to direct a verdict of sanity.  Wisconsin has a

12  bifurcated procedure similar to the procedure used in California to determine a plea of not guilty

13  by reason of insanity.  It also has a similar test of sanity.  In Leach, the trial court determined the

14  evidence was insufficient to establish that the petitioner was insane at the time of the offenses,

15  and directed a verdict of sanity.  The Seventh Circuit denied a subsequent petition for writ of

16  habeas corpus, finding no constitutional violation where a judge removes the issue of sanity from

17  the jury after the defendant has failed to present evidence sufficient to support the insanity plea.

18  With reasoning similar to the decision of the California Court of Appeal in the instant case, the

19  Seventh Circuit explained:

20              . . . the successful assertion of the affirmative
             defense in phase two results in a non-criminal
21           sanction disposition.  Thus, it is clear that phase two
             is not determinative of guilt in the sense of criminal
22           conduct but only determinative of the disposition of
             the defendant in terms of the treatment to be
23           afforded one who was insane at the time the guilty
             conduct was performed.' [Citation.]
24
             We, of course, are bound by the Wisconsin Supreme Court's
25           interpretation of Wisconsin law.  [Citations.]  Thus, because the
             insanity defense in Wisconsin is 'not concerned with the elements
26           of criminal conduct,' [citation], we hold that the Wisconsin courts

20

are not definitively prohibited by the sixth and fourteenth amendments from directing verdicts against criminal defendants on the issue of insanity. [Citation.] On the contrary, Wisconsin's rule permitting trial courts to direct a verdict on the insanity defense when there is insufficient evidence to create a jury question on this issue is in accord with the practice of a number of other state and federal courts, including this court, of withdrawing the issue of insanity from the jury under similar circumstances. [Citations.] Although these [cited] cases speak in terms of a trial court's refusal to instruct the jury on the issue of insanity, this court has recognized that a refusal to instruct and a directed verdict have the same result: removing the issue from the jury's consideration. [Citation.] Thus, when a defendant fails to present sufficient evidence to sustain his assigned burden of proof under state law, he clearly has no right to have the insanity question submitted to the jury in the hope that they will acquit him based on sympathy, caprice, or compromise. See Strickland v. Washington, 466 U.S. 668, 695, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) ( "A defendant has no entitlement to the luck of a lawless decision maker. . . ."). As the Supreme Court stated in Patterson v. New York, 432 U.S. 197, 206, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977): "[O]nce the facts constituting a crime are established beyond a reasonable doubt, . . . the State may refuse to sustain the affirmative defense of insanity unless demonstrated by a preponderance of the evidence." . . .

911 F.2d at 1255-56 (footnotes omitted).

In United States v. Whitehead, 896 F.2d 432 (9th Cir. 1990), the trial court refused to instruct the jury on defendant's sanity defense where the evidence was insufficient to support a finding of insanity. The Ninth Circuit concluded that a defendant is entitled to a jury instruction on insanity only when the evidence would allow a reasonable jury to find that insanity has been shown with "convincing clarity." Similarly, in United States v. Long, 562 F.3d 325 (5th Cir. 2009), the Fifth Circuit addressed the issue of "whether the district court, as gatekeeper and not as factfinder, should have granted the defendant's request to put his affirmative defense of insanity to the jury in the first place." Id. at 328. The court confirmed that a trial court may reject a requested insanity instruction if it concludes, after construing the evidence in the light most favorable to the defendant, "that the relationship between a defendant's mental illness history and his criminal conduct has not been explained or examined in *any meaningful way*."

/////

1   Id. at 331 (emphasis in original; quoting United States v. Dixon, 185 F.3d 393, 407 (5th Cir.

2   1999)).

3         In light of the cases cited above, the decision of the California Court of Appeal

4   that a trial court may direct a verdict of sanity if a defendant fails to introduce sufficient evidence

5   of insanity is not contrary to or an unreasonable application of federal law.  Accordingly,

6   petitioner is not entitled to habeas relief on these claims.

7         3.  Sufficiency of the Evidence

8         As noted, petitioner also claims that even if the trial court had the power to direct

9   a verdict of sanity, the evidence in support of his insanity defense was sufficient to submit the

10   issue to the jury.

11         In order to prevail on an insanity defense under California law, petitioner was

12   required to "offer[ ] sufficient evidence for a jury to reasonably conclude that, based on a mental

13   disease or defect, he was incapable of: (1) knowing or understanding the nature and quality of his

14   acts; or (2) distinguishing right from wrong when he robbed the coffee shop in January 2000 and

15   the two stores in May 2000."  Severance, 138 Cal.App.4th at 322.  As explained by the

16   California Court of Appeal, the directed verdict of sanity in this case would be improper if there

17   was substantial evidence from which the jury reasonably could have found petitioner was insane

18   when the crimes were committed.  Id. at 319-20.  Thus, the relevant question is whether

19   petitioner presented sufficient evidence of his insanity to create a jury question on this issue.

20         For the reasons described by the California Court of Appeal, petitioner failed to

21   meet his burden of demonstrating he was insane at the time he committed the charged crimes.

22   Petitioner's evidence in support of his insanity defense consisted solely of his own testimony.

23   Petitioner offered no evidence at all tending to show he was insane at the time he committed the

24   January 2000 robbery.  Further, his self-serving and unsupported testimony failed to meet his

25   burden of proving by a preponderance of the evidence that he was legally insane at the time of

26   the May 2000 robberies.  The state court opinion rejecting petitioner's arguments is a reasonable

construction of the evidence in this case and is not contrary to or an objectively unreasonable

application of federal law.  See Woodford, 537 U.S. at 25; 28 U.S.C. § 2254(d)(1).  Accordingly,

petitioner is not entitled to habeas relief on his claim that the evidence introduced at his trial was

sufficient to create a jury question on his insanity defense.

    B.  Right to Self-Representation

        Petitioner's final claim is that he was improperly denied the right to represent

himself at the sanity phase of his trial.  (Pet. at 7.)  He states that his request for self-

representation was "not a 'delay' tactic."  (Id.)  The California Court of Appeal denied this claim

in the unpublished portion of its opinion on petitioner's second appeal, reasoning as follows:

> Defendant first contends the trial court erred in denying his request
> to represent himself during the sanity trial.  We find no error.
>
> "A criminal defendant has a right to represent himself at trial under
> the Sixth Amendment to the United States Constitution.
> [Citations.]  A trial court must grant a defendant's request for self-
> representation if three conditions are met.  First, the defendant
> must be mentally competent, and must make his request knowingly
> and intelligently, having been apprised of the dangers of self-
> representation.  [Citations.]  Second, he must make his request
> unequivocally.  [Citations.]  Third, he must make his request
> within a reasonable time before trial."  People v. Welch, 20 Cal.4th
> 701, 729.)
>
> Defendant contends all three conditions were met here on October
> 13, 2004, when he first asserted to the trial court that he was still
> representing himself from the first trial.  The People contend the
> second and third conditions were not met.
>
> We will assume for the sake of argument that defendant satisfied
> the second condition on October 13, 2004, as he contends;
> nonetheless, we conclude the trial court acted well within its
> discretion in denying the request for self-representation because it
> was not made within a reasonable time before trial.
>
> In People v. Windam (1977) 19 Cal.3d 121, the Supreme Court
> explained the reason for requiring a reasonably timely request:
> "[A] defendant should not be allowed to misuse the Faretta
> mandate [of self-representation] as a means to unjustifiably delay a
> scheduled trial or to obstruct the orderly administration of justice.
> For example, a defendant should not be permitted to wait until the
> day preceding trial before he moves to represent himself and
> requests a continuance in order to prepare for trial without some

showing of reasonable cause for the lateness of the request.  In such a case the motion for self-representation is addressed to the sound discretion of the trial court . . . .  When the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted.  When, on the other hand, a defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation without any ability to test the request by a reasonable standard." (Id. at p. 128, fn. 5.)

Thus, the question here is whether the trial court abused its discretion in determining that defendant had not shown a reasonable cause for the lateness of his request to represent himself and instead was merely seeking to delay the orderly processes of justice.  To answer this question, we must examine what happened in this case between January 2003, when this court returned the case to the trial court, and October 2004, when the sanity trial was finally held.

On February 7, 2003, following the issuance of the remittitur, the court reappointed McEwan to represent defendant.  The court then appointed two doctors to examine defendant, both of whom produced reports in March 2003 concluding defendant was sane at the time of his crimes.

In April 2003, the case was set to be tried on July 17.  On that date, McEwan was in trial, so the trial was continued to September 4.  When that date arrived, the court relieved McEwan (apparently because he did not have time to represent defendant) and appointed a new attorney for defendant.  The case was reset to be tried in November and was assigned out for trial on November 25 to department 31, but the assigned judge granted a continuance for good cause until January 29, 2004.

At a trial setting conference on January 8, 2004, jury trial was confirmed for January 29.  On January 29, the case was once again assigned out for trial, this time to department 35.  Defendant appeared with his attorney, and the court addressed various pretrial motions and then continued the trial until February 2, the following Monday, for jury selection.  At no point during this hearing (the first one appearing in the reporter's transcript) did defendant ask for a new attorney, ask to represent himself, or claim he was still representing himself.

On February 2, the court continued the trial until February 19 because of the unavailability of an expert witness.  Again, defendant did not ask for a new attorney, ask to represent himself, or claim he was still representing himself.

/////

/////

24

On February 19, the case was assigned out for trial for a third time, this time to department 25.  The assigned judge continued the trial to February 23.  On that day, defendant's attorney was ill, so the court continued the trial to the next day.  On January [*sic*] 24, the court began by ruling on a motion by the prosecution to admit defendant's prior offenses.  Then, just as the court was calling the first prospective jurors into the courtroom, defendant told the court he "need[ed] to make a <u>Marsden</u> motion."[13]  In chambers, defendant contended his attorney was not properly defending his interests because "[h]e refuses to allow me to call witnesses on my own behalf" and "[h]e's lied to me several times."  Defendant claimed he had never talked to any investigator, even though his attorney "said that he sent an investigator to talk to me."  Defense counsel explained that he had hired a doctor to evaluate defendant and that doctor had come to the same conclusion as the two doctors appointed by the court – that defendant was sane.  Counsel further asserted that defendant had not identified any witnesses and that an investigator had spent "a great deal of time" with defendant.

The trial court denied defendant's <u>Marsden</u> motion, stating that "the timing of the motion implies an effort to in fact delay the process."  Before the prosecutor was allowed back in the courtroom, the court gave defense counsel a moment to talk to defendant.  Counsel then stated on the record that defendant was "becoming agitated and cursing at me, becoming hostile towards me [and] still claiming he's never met the investigator."  Defendant told the court, "Your Honor, I have a bunch of witnesses that I need to call on my behalf.  These are competent witnesses.  My little brother, psychiatrists . . . ."  When the court asked defendant to "[g]ive me the names of every one [sic] you want to call as witnesses, who they are, where they're located and when you first gave those names to counsel," defendant responded, "He has never talked to me so I can give [them to] him.  I was able to give one name to him and that was it."  Eventually, the court asked defense counsel whether he believed defendant should be referred for a competency evaluation, and counsel stated it was his belief that defendant was malingering.  The court reiterated that the <u>Marsden</u> motion was "not well taken" because "counsel has done what any competent counsel would do in trying to evaluate this case."  The court then suspended the proceedings and appointed doctors to examine defendant.

One doctor concluded defendant was "malingering to suit his purposes," but the second concluded he was incompetent because he "does likely suffer a mental disorder," "although there is some concern regarding the possibility of malingering."  A third doctor later agreed with the first that defendant was competent.

---

[13] <u>People v. Marsden</u> (1970) 2 Cal.3d 118.

25

A competency hearing was eventually held on October 13, 2004. Defendant was sworn and gave his name but would not answer any other questions.  The court considered the medical reports (including those from March 2003) and the transcript of a taped conversation between defendant and his brother, in which defendant said, among other things, "I'm doing the homeless nut routine."  Noting that all of the doctors agreed defendant was malingering,[14] the court found defendant was competent and reinstated the criminal proceedings.  The court then addressed whether defendant should be chained during the trial and held an in camera hearing regarding threats defendant had allegedly made to his attorney.  During that hearing, defendant denied making any threats and said, "He's not even my attorney" and "I'm pro per on this case."  Defendant repeated these assertions several times and also repeated the assertion he had made at the hearing on the <u>Marsden</u> motion in February that his attorney was lying. Ultimately, the court told defendant he was "mistaken" in his assertion that he was pro per.

On October 18, the next court date, the court instructed defendant that the trial could proceed in his absence if he was disruptive. When asked if he understood that, defendant responded, "I'm not ready for trial, your Honor.  I haven't contacted any of my witnesses."  After defendant repeated this for a third time, the court told him his attorney was "going to take care of the witnesses," and defendant once again asserted, "I'm pro per."

The court told defendant they would address his pro per rights later and then held another in camera hearing to further address whether defendant should be chained during the trial.  When the subject turned again to defendant's threats against his attorney and defendant was given the chance to respond, he said, "This man is not my attorney.  I am pro per on this case.  This man is not helping me at all.  He was supposed to be helping me, but he hasn't.  He has continually lied to me. . . .  [¶]  [I] have not been able to contact any of my witnesses.  And this man wouldn't help me do it."  When the court eventually turned to the issue of defendant's pro per status, the court reminded defendant that he had been represented ever since McEwan was appointed to represent him at the conclusion of his trial.  Defendant disagreed, asserting he had asked for an attorney only for the sentencing phase.  The court then explained that "since your appeal, the case has been returned to this court and you have had, by my count, over 20 appearances with counsel."  When asked for a response, defendant said, "He's supposed to be helping me.  I haven't had 20 appearances.  I've got them all wrote down here.  [¶] . . . [¶]  I wasn't.  I stopped talking to this man back in January, I believe it was.  Right there before –

---

[14]  After reviewing the transcript of the conversation between defendant and his brother, the doctor who had initially concluded defendant was incompetent changed her mind.

before the – I made the <u>Marsden</u> motion, because he was just – he refused to help me.  [¶]  He told me he's not going to get me any addresses, he told me he's not going to do anything for me."  The exchange continued with the court asking defendant why he was requesting to be pro per "on the day that we're picking a jury," to which defendant responded, "Because I am pro per."

Ultimately, the court decided to treat defendant's assertions of pro per status as a request to represent himself, and the court asked him how much time he needed to prepare; defendant said, "At least three months."  Defense counsel then explained that defendant had given his private investigator the names of some people, but some of them were fictional and others had no idea who defendant was. He further claimed he had "done everything that [he] could from the information" defendant had given him.  Defendant continued to assert that his attorney was lying.

Back in open court, the prosecution opposed a continuance, asserting defendant was simply attempting to delay the proceedings.  The court then addressed whether defendant had shown reasonable cause for the lateness of his request to represent himself.  The court noted that defendant's attorney had "an excellent reputation and has always done a very thorough and good job on behalf of his client," that defendant had "a proclivity to substitute counsel," that he had "threatened his attorneys in efforts to disrupt these proceedings," and that he had made numerous court appearances with counsel since February 2003 and never "asserted any pro per rights during those appearances."  Based on those factors, the court concluded defendant's purpose was "to delay or disrupt the proceedings," and the court denied his request to represent himself.

On the facts set forth above, the trial court was well within its discretion in concluding that defendant did not show reasonable cause for the lateness of the request to represent himself and instead was merely seeking to delay the orderly processes of justice.

Defendant insists his request was timely because it was made "at the first opportunity after criminal proceedings resumed" in October 2004 after they were suspended in February 2004.  The problem with this argument is that it ignores the year that elapsed from February 2003, when the case first came back from this court, until February 2004, when the proceedings were suspended to evaluate defendant's competence.  During that period, despite the fact that he had represented himself at the guilt phase trial, defendant never asked to represent himself or asserted that he was still representing himself, despite numerous opportunities to do so. On the contrary, defendant was apparently content to be represented by McEwan from the time the case came back from this court in February 2003 until McEwan was relieved in

1   September 2003.  After that, he was apparently content to be
    represented by his new attorney, all the way until February 24,
2   2004, when, at the *very moment* the trial court was calling the first
    prospective jurors into the courtroom, he told the court he needed
3   to make a Marsden motion.

4   As the trial court noted, the timing of defendant's Marsden motion
    implied an effort to delay the proceeding.  The same is true of his
5   request to represent himself because, as a practical matter, that
    request followed almost immediately on the heels of the earlier
6   Marsden motion.  The criminal proceedings were suspended right
    after the denial of the Marsden motion on February 24 until
7   October 13.  When the proceedings resumed, defendant almost
    immediately began expressing his dissatisfaction with his attorney
8   again and sought to represent himself.  On these facts, the trial
    court could reasonably conclude that defendant's dissatisfaction
9   with his attorney – which was the basis for both his Marsden
    motion and his request to represent himself – was not justified but
10  was merely an effort to secure a further delay in the proceedings.

11  It is true that a defendant does not have to prove justifiable
    dissatisfaction with his attorney to exercise his right to self-
12  representation, but when a defendant's belated request to represent
    himself stems from an asserted dissatisfaction with his attorney, the
13  court must evaluate that assertion to determine whether the
    defendant has shown reasonable cause for the lateness of the
14  request.  Here, the trial court essentially concluded defendant's
    complaints against his attorney were not justified and therefore
15  defendant did not have reasonable cause for waiting until the day
    of trial to request to represent himself.  We find no abuse of
16  discretion in that conclusion.

17  (Lodged Document 5 (Opinion of the Court of Appeal, Third Appellate District, No. C048410

18  (hereinafter Opinion)) at 9-19 (emphasis in original).)

19          The United States Supreme Court has held that a criminal defendant has a

20  constitutional right to represent himself at trial.  Faretta v. California, 422 U.S. 806, 832 (1975).

21  That right is not absolute, however, as the Supreme Court has recognized: "The defendant must

22  'voluntarily and intelligently' elect to conduct his own defense, . . . and most courts require him to

23  do so in a timely manner."  Martinez v. Court of Appeal, 528 U.S. 152, 161-62 (2000).  The

24  Ninth Circuit Court of Appeals has determined that "a timeliness element in a Faretta request is

25  'clearly established Federal law, as determined by the Supreme Court.'"  Marshall v. Taylor, 395

26  F.3d 1058, 1061 (9th Cir. 2005) (quoting Moore v. Calderon, 108 F.3d 261, 265 (9th Cir. 1997),

                                                28

1   abrogated on other grounds by Williams, 529 U.S. at 412-13).  Specifically, a request to represent

2   oneself made "well before the date of trial" and "weeks before trial" is timely.  Id. at 1060-61.

3   However, "[b]ecause the Supreme Court has not clearly established when a Faretta request is

4   untimely, other courts are free to do so as long as their standards comport with the Supreme

5   Court's holding that a request 'weeks before trial' is timely.'"  Id. at 1061.

6          As explained by the California Court of Appeal, petitioner's first Marsden motion

7   came on for hearing on the first scheduled day of trial, "just as the court was calling the first

8   prospective jurors into the courtroom."  (Opinion at 12.)  After the Marsden hearing, the trial

9   court suspended the proceedings and appointed doctors to examine petitioner.  Petitioner did not

10  request self-representation at that time, nor did he assert that he was proceeding in pro per.  On

11  October 13, 2004, five days prior to the next scheduled trial date, petitioner for the first time

12  expressed his belief that he was proceeding "pro per."  (Id. at 14-15.)  Assuming that this

13  assertion constituted a Faretta request for self-representation,[15] the request fell well outside the

14  "weeks before trial" standard set forth in Faretta.  Petitioner's next mention of a request to

15  represent himself came on October 18, 2004, the next scheduled trial date.  (Id. at 15-16.)  Again,

16  this request fell well outside the standard set forth in Faretta.  Under these circumstances, the

17  California Court of Appeal was not objectively unreasonable in concluding that petitioner's

18  motion for self-representation was untimely.  See Stenson v. Lambert, 504 F.3d 873, 884 (9th

19  Cir. 2007), cert. denied, ___ U.S. ___, 129 S. Ct. 247 (2008) ("[t]he Supreme Court has never

20  held that Faretta's 'weeks before trial' standard requires courts to grant requests for

21  self-representation coming on the eve of trial"; therefore, state court's "determination that

22

23          [15] In United States v. Roberto Mendez-Sanchez 563 F.3d 935 (W.D. Wash. 2009), the
    Ninth Circuit Court of Appeals held that a request for self-representation must be "unequivocal"
24  and that a request made while in the midst of discussions regarding a motion for substitution of
    counsel may not be sufficient to invoke Faretta rights.  Id. at 939, 944-46.  While petitioner's
25  statement that he was "pro per" might not constitute an unequivocal request for self-
    representation, this court will assume for the sake of these findings and recommendations, as did
26  the state court, that petitioner's statements constituted a Faretta request.

1   [petitioner's] request to proceed pro se [which first came on the twentieth day of voir dire and on

2   the verge of jury impanelment] was untimely is not objectively unreasonable under AEDPA");

3   <u>Marshall</u>, 395 F.3d at 1061 (<u>Faretta</u> request untimely where made on the morning of trial but

4   prior to jury selection); <u>Baker v. Yates</u>, No. 04-CV-1533 H(BLM), 2007 WL 2156072, *9-10

5   (S.D. Cal., Jul. 25, 2007) (state court did not unreasonably apply <u>Faretta</u> in denying as untimely

6   motion for self-representation made the day trial was scheduled to begin).

7           The California Court of Appeal also concluded that petitioner's <u>Faretta</u> motion

8   was properly denied on the basis that it was made for the purpose of delay.  The Ninth Circuit has

9   held that to preserve the right to self-representation, a defendant must make a timely and

10  unequivocal request that is not a tactic to secure delay.  <u>Armant v. Marquez</u>, 772 F. 2d 552, 555

11  (9th Cir. 1985).  In deciding whether a timely request was otherwise made for the purpose of

12  delay, the court must examine the events preceding the request to determine if they are consistent

13  with a good faith assertion of the <u>Faretta</u> right and whether the defendant could reasonably be

14  expected to have made the request at an earlier time.  <u>Fritz v. Spalding</u>, 682 F.2d 782, 784-85

15  (9th Cir. 1982).  If a defendant accompanies his motion to proceed with a request for a

16  continuance "[this] would be strong evidence of a purpose to delay."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Hirschfield v.</u>

17  <u>Payne</u>, 420 F.3d 922, 927 (9th Cir. 2005) (state court was not unreasonable in concluding <u>Faretta</u>

18  motion was made to delay proceedings where defendant requested self-representation one day

19  before trial was scheduled to begin, had moved to substitute counsel on four previous occasions,

20  and admitted every time he asked for a new attorney it was "close to trial").

21          Although the <u>Faretta</u> decision itself did not mention the issue of delay, the

22  conclusion of the Ninth Circuit that a <u>Faretta</u> motion may be denied if it is interposed for

23  purposes of delay does not appear to be "contrary to" or an "unreasonable application" of the

24  holding in  <u>Faretta</u>.  Therefore, even if petitioner's request for self-representation had been timely

25  made, the trial court could have properly denied the motion as a tactic being employed to delay

26  the trial.  Although petitioner complained his trial counsel had failed to investigate and produce

1   witnesses, the only witnesses petitioner mentioned were his "little brother," and "psychiatrists."

2   (Opinion at 13.)  He did not explain why these witnesses would have been helpful to him, nor did

3   he describe the substance of their proposed testimony.  Counsel later informed the court that

4   some of petitioner's proposed witnesses "were fictional and others had no idea who [petitioner]

5   was." (<u>Id.</u> at 16.)  When asked whether he was ready for trial, petitioner stated he needed "at

6   least" three months to prepare. (<u>Id.</u>)  There is no reason apparent from the record why petitioner

7   could not have made his request to represent himself earlier in the proceedings.  Further, as

8   discussed by the California Court of Appeal, petitioner's expressed concerns with his trial

9   counsel were unfounded and appeared to be interposed for the purpose of delay.  (<u>Id.</u> at 19.)  All

10  of these factors provide support for the trial court's conclusion that petitioner's <u>Faretta</u> motion

11  was intended to delay the trial.  Although petitioner states he did not move for self-representation

12  in order to delay the proceedings, the record before the court supports the state court's conclusion

13  that he did.

14          For the foregoing reasons, the state appellate court's conclusion that petitioner's

15  <u>Faretta</u> motion was properly denied is not contrary to or an unreasonable application of federal

16  law.  Accordingly, petitioner is not entitled to relief on a claim that he was denied his right to

17  represent himself.  28 U.S.C. § 2254(d).

18          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

19  application for a writ of habeas corpus be denied.

20          These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  /////

26  /////

1   shall be served and filed within ten days after service of the objections.  The parties are advised

2   that failure to file objections within the specified time may waive the right to appeal the District

3   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

4   DATED:  June 16, 2009.

5

6   _____

7   U.S. MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   8:severance1964.hc

26